948 F.2d 271
 16 UCC Rep.Serv.2d 105
 LEILA HOSPITAL AND HEALTH CENTER, Plaintiff-Appellee, Cross-Appellant,
v.
XONICS MEDICAL SYSTEMS, INC.; Xonics, Inc., Defendants,
Elscint Ltd.; Elscint, Inc.; Elscint Imaging, Inc.,
Defendants, Cross-Defendants-Appellees,
National Surety Corporation, Defendant,
Cross-Claimant-Appellant, Cross-Appellee.
 Nos. 90-1961, 90-1975.
 United States Court of Appeals,
Sixth Circuit.
 Argued Sept. 24, 1991.
Decided Nov. 4, 1991.
 
 Douglas W. VanEssen (argued), Lee T. Silver, Mark R. Smith and Gwen E. Hoekstra (briefed), Clary, Nantz, Wood, Hoffius, Rankin & Cooper, Grand Rapids, Mich., for Leila Hosp. and Health Center.
 Jeffrey v. Stuckey, Joseph A. Fink (argued and briefed), William C. Bertrand, Jr., Dickinson, Wright, Moon, Van Dusen & Freeman, Lansing, Mich., for Elscint, Ltd., Elscint, Inc. and Elscint Imaging, Inc.
 Robert G. Russell, Kerr, Russell & Weber, Joanne Geha Swanson (argued and briefed), Melissa Horne (briefed), Kerr, Russell & Weber, Detroit, Mich., for Nat. Sur. Corp.
 Before MILBURN and SUHRHEINRICH, Circuit Judges, and BROWN, Senior Circuit Judge.
 SUHRHEINRICH, Circuit Judge.
 
 
 1
 Leila Hospital and Health Center ("Leila") won a judgment of $568,563.80 against National Surety Corporation ("NSC") in this action arising out of a contract breach. NSC and Leila challenge a summary judgment ruling in favor of Elscint Ltd., Elscint Inc., and Elscint Imaging. NSC attacks the denial of its summary judgment motion and complains of adverse rulings in the district court. Finally, Leila cross-appeals from the exclusion of evidence concerning consequential damages. We affirm.
 
 
 2
 * In mid-1983 Leila contracted with Xonics Medical Systems ("Xonics") to acquire digital subtraction angiographic x-ray equipment. Specifically, Xonics agreed to sell its as yet undeveloped DR-30 Digital System. To secure the contract Leila purchased a performance bond from NSC in the amount of the purchase price, $843,468.63.
 
 
 3
 Delivery and installation of the Digital Stand and DR-10 system occurred in mid-October 1983. By December 1983 Leila had paid $671,079.79 of the total price (80%), although it still awaited receipt of the DR-20 and DR-30 systems.
 
 
 4
 On December 6, 1983 Xonics transferred its sales and service group together with certain assets to a newly created wholly-owned subsidiary, Xonics Sales and Service Corporation ("XSSC"). Seventeen days later XSSC was purchased by Elscint Ltd. and its wholly-owned subsidiary, Elscint Inc. Under the stock purchase agreement between XSSC and Elscint, Xonics transferred to Elscint all unfilled customer orders for products manufactured by Xonics. In addition, Elscint was to perform all of Xonics' obligations relating to customer orders.
 
 
 5
 Leila learned of these developments in a December 30, 1983 letter from Xonics President Charles Haverty. Elscint repeatedly reassured Leila that the contract would be completed. These assurances took on additional meaning following Xonics' entry into Chapter 11 Bankruptcy on February 17, 1984.
 
 
 6
 Leila had received neither the DR-20 or DR-30 systems when informed in December 1985 that Elscint considered itself no longer obligated to complete the contract. Leila reported Xonics' default to NSC and expressed its intent to revoke acceptance of equipment previously received. Leila also demanded full payment of the performance bond from NSC.
 
 
 7
 In September 1986 Leila brought a breach of contract suit in the United States District Court for the Western District of Michigan against Xonics, Elscint and NSC. NSC cross-complained against Elscint alleging the latter's liability under novation and substitution of obligors theories. The district court granted summary judgment dismissing Elscint from the suit. NSC's motion for summary judgment discharging it from liability under the performance bond was denied. A jury returned a verdict of $568,563.80 plus interest in favor of Leila and against NSC.
 
 
 8
 On appeal, NSC and Leila contest the summary judgment ruling in favor of Elscint. NSC attacks the district court's denial of its motion for summary judgment. NSC further appeals the court's refusal to decide the revocation issue as a matter of law, the admission of evidence sought to be excluded by its motion in limine, and instructions to the jury. NSC also submits that the damage award was excessive and that Leila's failure to timely notify Xonics bars its recovery. Lastly, Leila appeals the exclusion of evidence regarding consequential damages.
 
 II
 
 9
 * This court reviews a grant of summary judgment de novo. EEOC v. University of Detroit, 904 F.2d 331 (6th Cir.1990). NSC and Leila advance three arguments to reverse the district court's grant of summary judgment to Elscint.
 
 
 10
 First, NSC contends that the stock purchase agreement between Xonics and Elscint novated the Leila-Xonics contract. On this theory, NSC's duties under the performance bond terminated when Elscint acquired XSSC and liability falls on Elscint alone.
 
 
 11
 The elements of novation are well settled under Michigan law. Harrington-Wiard Co. v. Blomstrom Manufacturing Co., 166 Mich. 276, 131 N.W. 559 (1911). As recently stated in Devitt v. Quirk, 105 Mich.App. 94, 306 N.W.2d 405 (1981), the following four elements are necessary to establish novation:
 
 
 12
 (1) parties capable of contracting;
 
 
 13
 (2) a valid prior obligation to be displaced;
 
 
 14
 (3) the consent of all the parties to the substitution based upon sufficient consideration;
 
 
 15
 (4) the extinction of the old obligation and the creation of a valid new one.
 
 
 16
 Id. at 97, 306 N.W.2d 405.
 
 
 17
 Xonics understood the stock purchase agreement to leave intact its obligation to manufacture x-ray equipment, including Leila's DR-30 system. The stock agreement transferred sales and service functions, not the duty to manufacture the DR-30. In addition, both Elscint and Leila have consistently denied any intent to release Xonics of its duty to manufacture the DR-30. Absent evidence of the necessary element of consent by all the parties, there is no genuine issue of material fact regarding novation.
 
 
 18
 The second argument offered to reverse the summary judgment involves promissory estoppel. Leila and NSC aver that Elscint is estopped from denying liability because of Leila's detrimental reliance on Elscint's repeated promise to complete the contract. In Michigan promissory estoppel requires that the promise relied upon be "definite and clear." McMath v. Ford Motor Company, 77 Mich.App. 721, 726, 259 N.W.2d 140 (1977). The elements of promissory estoppel are:
 
 
 19
 (1) a promise,
 
 
 20
 (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee,
 
 
 21
 (3) which in fact produced reliance or forbearance of that nature,
 
 
 22
 (4) in circumstances such that the promise must be enforced if injustice is to be avoided.
 
 
 23
 Id. at 725, 259 N.W.2d 140.
 
 
 24
 The threshold issue is whether or not Elscint made a clear and definite promise to manufacture the DR-30 system. If so, Leila's detrimental reliance was reasonable. Elscint's promise was clear only as it related to delivery and service. Moreover, Leila was only too aware of the history of problems associated with development of the DR-30. For promissory estoppel purposes, Leila's reliance on an unclear promise by Elscint to manufacture the DR-30 was not reasonable. Fredenburg v. Lyon Lake M.E. Church, 37 Mich. 476, 478 (1877) ("Estoppels never arise from ambiguous facts; they must be established by those which are unequivocal, and not susceptible of two constructions.").
 
 
 25
 Finally, Leila argues that as third party beneficiary of the stock purchase agreement it is entitled to enforce obligations Elscint acquired from Xonics, including the duty to manufacture the DR-30. Since Elscint acquired no such duty, it cannot be liable.
 
 B
 
 26
 Denial of a motion for summary judgment is reviewed for abuse of discretion. Pinney Dock & Trans. Co. v. Penn Cent. Corp., 838 F.2d 1445 (6th Cir.), cert. denied, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). NSC submits three claims in support of its own summary judgment motion: (1) there was a substitution of obligors, (2) the performance bond expired, and (3) Leila's overpayment damaged NSC.[1]
 
 
 27
 First, NSC relies on suretyship law to argue that a substitution of obligors or a material increase in risk to the surety caused by some action of the obligor releases a surety from its obligations. Surety law suggests that a substitution of obligors releases the surety because it creates "a different contract on which they [the surety] never intended to become liable." Farmers Co-operative Creamery Co. v. Huhn, 241 Mich. 23, 27, 216 N.W. 370 (1927). To rely on this principle a surety must demonstrate "a material departure from the contract which resulted in some injury to the surety." Grinnell Realty Co. v. General Casualty & Surety Co., 253 Mich. 16, 22, 234 N.W. 125 (1931).
 
 
 28
 The change here concerned a shift in sales and service responsibilities accompanying Elscint's purchase of Xonics. The duty to manufacture the DR-30 was retained by Xonics. It was the duty to manufacture that was guaranteed by the surety through the performance bond. (Jt.App. at 497). NSC's arguments to the contrary are conclusory and unsupported by evidence in the record.
 
 
 29
 Second, NSC offers a clever but ultimately unavailing reading of the contract's 80%-20% payment plan to support its claim that the bond expired before Leila demanded payment. The original agreement called for Leila to pay 80% of the purchase price "upon delivery of the major components." (Jt.App. at 490). By December 22, 1983 Leila had made payments totalling 80%. Therefore, NSC reasons, all "of the major components" must have been delivered. Because the bond expired six months after delivery NSC identifies June 21, 1984 as the date of the bond's expiration.
 
 
 30
 It is a mistake to consider delivery of the major components complete in the absence of the DR-30. The plain language of Leila's purchase order and of Xonic's letter of agreement call attention to Leila's desire to acquire the DR-30. NSC's claim amounts to a grafting of words from the contract onto language from the performance bond. Thus language is manufactured to suggest that the bond expired six months after the date of delivery of the major components. But no such language appears anywhere in the record. Moreover the purchase order's language on expiration refers to six months after the delivery of the system, not just the major components. Since the system purchased included the DR-30, the performance bond has not yet expired.
 
 
 31
 Third, NSC contends that Leila's overpayment materially injured NSC and discharges it from liability as a matter of law. NSC labels the 80%-20% payment plan as a security for both the buyer and the surety. Citing Prairie State National Bank of Chicago v. U.S., 164 U.S. 227, 239, 17 S.Ct. 142, 147, 41 L.Ed. 412 (1896) (quoting Finney v. Condon, 86 Ill. 78 (1877)), NSC suggests that "[a]n amount required by the contract to be reserved to secure completion must be so reserved both as security for whom the contract is to be performed and as an indemnity for the surety."
 
 
 32
 NSC's reliance on Prairie State is inapposite. Prairie State holds that a surety suffers injury when an amount it has previously agreed upon as an indemnity is discharged without its knowledge or consent. Prairie State, 164 U.S. at 239, 17 S.Ct. at 147. This principle does not apply to the facts before us. NSC made no attempt to negotiate an agreement with Leila to reserve 20% of the purchase price as an indemnity to the surety. For NSC to come forward now and claim Leila's 20% cushion was all the while an indemnity for NSC is disingenous.
 
 
 33
 For these reasons we affirm the district court's denial of NSC's motion for summary judgment.
 
 C
 
 34
 NSC appeals the trial court's decision to send to the jury the issue of Leila's right to revoke the contract. Applying Michigan revocation law, the court found questions of fact that required jury resolution. The jury upheld Leila's revocation as executed in an April 25, 1986 letter to NSC.
 
 
 35
 In Michigan a "buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him." M.C.L. § 440.2608(1). A buyer's right to revoke is, however, limited: "[r]evocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects." M.C.L. § 440.2608(2).
 
 
 36
 The remedies available to a buyer who revokes are identified in M.C.L. § 440.2711:
 
 
 37
 (1) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (section 2612), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid
 
 
 38
 (a) "cover" and have damages under the next section as to all the goods affected whether or not they have been identified to the contract.
 
 
 39
 The jury's verdict rests on a finding that Xonics' failure to deliver the DR-30 was a nonconformity resulting in a substantial impairment of value to Leila, that Leila's revocation occurred within a reasonable amount of time after its discovery of the nonconformity, and that Leila revoked before any substantial change in the condition of the goods. Under Michigan law, these findings are properly within the purview of the jury's consideration.
 
 
 40
 NSC's failure to persuade the jury on this point is not an entitlement to have the issue reconsidered as a matter of law. The district court's finding that revocation two years after installation might be considered reasonable is consistent with Fargo Machine & Tool Co. v. Kearney & Trecker Corp., 428 F.Supp. 364, 379 (E.D.Mich.1977), which held that "whether buyer has revoked within a reasonable time after he discovered or should have discovered nonconformity depends on the particular circumstances of the case." The issue of timely notification was properly left to the jury.
 
 
 41
 Whether there was substantial impairment of the value of the contract to Leila is also a question properly before the jury. Leila contends the nondelivery of the DR-30 coupled with the regular malfunctioning of existing systems caused it losses. NSC relies on Fargo to support its claim that objective evidence regarding Leila's receipt and use of the DR-10, digital stand, and Puck film changers shows that any nonconformity caused no substantial impairment of value.
 
 
 42
 Fargo is distinguishable on its facts. In Fargo the plaintiff was without the use of the machine on only one occasion in five and one-half years. By contrast, Leila has never enjoyed the use of the DR-30 and has reaped the benefits of the DR-10, DR-20, and digital stand only intermittently since their installation. These factual differences between Fargo and the present case lead us to resist NSC's argument on this point.
 
 D
 
 43
 NSC finds an inconsistency in the district court's handling of Leila's ongoing reliance on Elscint. When considering promissory estoppel the court stated that Leila's reliance on Elscint's assurances "was clearly not reasonable." (Jt.App. at 92). Yet the court admitted evidence of Leila's reliance in order to resolve the revocation claim.
 
 
 44
 NSC's argument boils down to a claim that an action cannot be simultaneously reasonable and unreasonable. If Leila's reliance was unreasonable as a matter of law for purposes of promissory estoppel analysis it should also be unreasonable for revocation analysis. Not so.
 
 
 45
 Reasonableness is a function of the different legal standards under which reliance is evaluated. Leila's reliance is unreasonable for promissory estoppel purposes because the promise relied upon was not definite and clear. Leila's reliance is reasonable for revocation purposes because it accounts for the delay in providing notification of Xonics' default. Reliance on Elscint was a way of avoiding premature revocation.
 
 
 46
 That the word reasonable carries two distinct meanings is a reflection of the fact that words gather meaning from the various contexts in which they are used. This moderate indeterminacy in language does not violate any principle of law, logic or language. It is simply a function of the pragmatic character of our speech. The district court's finding that Leila's reliance was unreasonable in one context but reasonable in another is consistent not only with the nature of law and language but also with the facts of this case.
 
 E
 
 47
 NSC considers the jury instructions erroneous, confusing and contradictory. Reversal is appropriate only if the jury instructions, when considered as a whole, were confusing, misleading, or prejudicial. Beard v. Norwegian Caribbean Lines, 900 F.2d 71, 72-73 (6th Cir.1990).
 
 
 48
 NSC's focus is on three statements addressing the reasonableness of Leila's revocation. In one statement the jury was instructed that revocation must be made within a reasonable time "after Leila Hospital was notified that the nonconformity would be cured." In a second statement the jury was advised that "whether the revocation occurred within a reasonable period of time after the nonconformity was discovered or should have been discovered depends upon the particular circumstances of the case." Third, the jury was instructed that no formal notice need be given "until it is apparent that the seller cannot perform the repairs."
 
 
 49
 The potentially confusing effect of the difference between, on the one hand, whether revocation must occur within a reasonable period of time following notification that the nonconformity would be cured, and, on the other hand, whether revocation is reasonable only if it occurs within a reasonable period of time after the nonconformity was discovered or should have been discovered constitutes the focus of NSC's appeal. This apparent inconsistency in terminology can be harmonized by examining controlling Michigan law.
 
 
 50
 The first instruction complained of appears to be derived from M.C.L. § 440.2608(1)(a): "The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it (a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured." (emphasis added)
 
 
 51
 The second instruction challenged is derived from M.C.L. § 440.2608(2), which provides that "[r]evocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects." (emphasis added)
 
 
 52
 The third instruction complained of relies on the language and authority of Fargo regarding the revocation of "complicated machinery and systems [that] may have relatively long ironing out periods during which the buyer in good faith continuously attempts to have the seller cure or repair complicated problems." Fargo, 428 F.Supp. at 379.
 
 
 53
 Considered as a whole, the jury instructions reflect an attempt to identify the various legal bases for understanding notice as it relates to revocation. The district court's instructions in this regard are consistent, reflecting distinct parts of the governing statute and case law. The jury instructions were not confusing, misleading or prejudicial.
 
 F
 
 54
 The jury's award of $568,563.80 plus interest is appealed as excessive, contrary to law and against the great weight of the evidence. We will not find an award excessive "if the verdict is within the range of proof and the jury was properly instructed." American Anodco, Inc. v. Reynolds Metals Company, 743 F.2d 417, 424 (6th Cir.1984). As noted, the trial court's instructions were not improper.
 
 
 55
 To the degree NSC goes beyond rehearsing arguments rejected below, it claims that Leila failed to mitigate damages and that NSC is entitled to various credits leading to a reduction in the award. The fact that upon review of the evidence we might arrive at an award different from that of the jury does not alone empower us to change the result reached by the jury. Unless the award is (1) beyond the range supportable by proof or (2) so excessive as to shock the conscience, Matulin v. Village of Lodi, 862 F.2d 609, 614-615 (6th Cir.1988), or (3) the result of a mistake, we must let the award stand. Neyer v. United States, 845 F.2d 641, 644 (6th Cir.1988).
 
 
 56
 The jury found that Leila was entitled to revoke acceptance of the Xonics equipment. The jury then proceeded to calculate damages by first, determining the amount paid by Leila to Xonics and second, subtracting from this amount any savings to Leila from its continued use of the equipment in its possession. The result of the jury's calculations, $568,563.80, is supportable by the evidence and is not so disproportionately large as to "shock the conscience." We are obligated to uphold the damage award.
 
 G
 
 57
 Leila appeals the exclusion of evidence on consequential damages. The district court relied on the express disclaimer of consequential damages made by Xonics. Leila responds by urging the court to read a provision of its purchase order as in conflict with Xonics' disclaimer. A conflict between warranty provisions would then trigger Michigan's implied warranty of merchantibility law, which not surprisingly permits recovery of consequential damages.
 
 
 58
 But the language of the purchase order on which Leila relies speaks only of holding Leila harmless from third party liability. It does not explicitly address the issue of consequential damages and cannot reasonably be interpreted to do so. Therefore we affirm the district court's ruling that Xonics' disclaimer of consequential damages was unchallenged by Leila.
 
 III
 
 59
 To summarize, we affirm the district court's grant of summary judgment in favor of Elscint and its denial of NSC's motion for summary judgment. We also affirm the jury verdict in favor of Leila in its entirety. On the cross-appeal, we affirm the exclusion of evidence regarding Leila's consequential damages.
 
 
 
 [1]
 NSC also raised a novation argument, but our rejection of that theory, supra, disposes of the novation claim here as well